892 So.2d 595 (2004)
CLASS ACTION CLAIM SERVICES, L.L.C.
v.
Brian CLARK.
No. 04-CA-591.
Court of Appeal of Louisiana, Fifth Circuit.
December 14, 2004.
*596 Joseph F. Bishop, Garcia & Bishop, Metairie, LA, for Plaintiff/Appellee.
William A. Stark, Sean Rabalais, Weeks & Stark, Houma, LA, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and SUSAN M. CHEHARDY.
THOMAS F. DALEY, Judge.
Plaintiff, Class Action Claims Services, L.L.C., filed suit against a former employee, Brian Clark, for violating the non-compete clause in the employment contract. Mr. Clark reconvened seeking unpaid commissions. The trial court ruled in favor of plaintiff and Mr. Clark has appealed. For the reasons that follow, we affirm the judgment of the trial court.

FACTS:
Class Action Claims Services, L.L.C. (hereinafter CACS) is in the business of assisting property owners in submitting claims to recover for damages incurred as a result of defective Masonite siding used on their property. CACS operates according to guidelines established by the claims administrator in a national class action settlement.
Ken Dugas, the president of CACS, testified that he hired Brian Clark as an agent for his company in October 1999. At that time, Mr. Clark signed a document entitled "Joint Venture Non-Compete Agreement." That agreement provided that Mr. Clark could not operate or work for the same type business in Louisiana, Arkansas, Texas, Mississippi, and Alabama. Mr. Dugas explained that he was later advised that the geographic area of the non-compete clause was overbroad and had a new document drawn up and signed by all of his agents. This document, also *597 entitled "Joint Venture & Non-Compete Agreement", was signed by Mr. Clark on April 21, 2000. This document provided in pertinent part:
The agent shall not, for a period of two (2) years following termination (for any reason) of this agreement directly or indirectly compete with the business of the Company in the Louisiana parishes of Acadia, Assumption, East Baton Rouge, Iberia, Iberville, Jefferson, Lafayette, Lafourche, Livingston, Orleans, Ouachita, Plaquemine, St. Bernard, St. Charles, St. James, St. John the Baptists, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Terrebonne, and West Baton Rouge; the Arkansas county of Pulaski; the Texas counties of Brazoria, Chambers, Fort Bend, Galveston, Grimes, Harris, Liberty, Montgomery, Waller, and Wharton; and the Mississippi county of Hancock.
The term "not compete" as used herein shall mean that the Agent shall not own, manage, operate, consult with, be employed, or enter into any agreement or any type or nature with another entity in competition with the Company or in a business substantially similar to or competitive with the present business of the Company or such other business in which the Company may substantially engage during the term of the Agreement.
Mr. Dugas explained that CACS obtained clients by distributing fliers and placing advertisements in newspapers and magazines. The fliers contained the pager number of the agent who passed out the fliers, as well as an 800 phone number for the main office, while the advertisements contained only the 800 number for the main office. Once the property owner alerted CACS that they wanted CACS to handle their claim, the agent met with the property owner and signed a contract, obtained other required documents such as proof of ownership, obtained a sample of the Masonite siding, and turned the sample and the forms into CACS, who reviewed it and then forwarded it to the claims administrator for payment. The property owner received 70% of the payment while CACS received 30%. Agents received 25% of CACS's fee for single properties and 15% for apartments. Agents were assigned clients who were obtained from fliers they passed out and from clients who contacted the CACS office as a result of advertisements. The clients who contacted CACS as a result of advertisements were assigned to the agents on a rotating basis called the "lead list."
Mr. Dugas testified that shortly after Mr. Clark began working for CACS he was placed in a managerial position in Louisiana wherein he would review the claims submitted by other agents before they were sent to the claims administrator. Towards the end of 2000 claims in Louisiana were nearly completed and new clients were being pursued in Texas. During the summer of 2000, Mr. Dugas suggested that Mr. Clark move to Houston, Texas to continue work for CACS. Mr. Clark moved to Houston and continued his managerial position being paid $500.00 per week in addition to commissions on the claims he reviewed. He continued to obtain clients through fliers he distributed and advertisements placed by CACS.
Mr. Dugas testified that in November 2000, Mr. Clark informed him that he no longer wanted the managerial responsibilities, so the $500.00 weekly payments were discontinued. Mr. Dugas testified that Mr. Clark continued to work for CACS as an agent soliciting clients and preparing claims. Mr. Dugas testified that at some point in the fall of 2000 Mr. Clark asked to be taken off of the lead list, thus he was no *598 longer assigned clients who called CACS's office 800 number directly. Mr. Dugas further testified that towards the end of 2000, Mr. Clark's productivity had declined and he was not submitting the four claims per month to CACS as provided for in the employment contract. Mr. Dugas explained that for this reason, Mr. Clark was terminated on January 23, 2001 for "non-productivity." Mr. Dugas testified that CACS continued to pay Mr. Clark commission checks on claims submitted prior to his termination until March 12, 2001.
Mr. Dugas testified that in March 2001 CACS received a phone call from a client checking on her claim. CACS had no record of this client or her claim. Mr. Dugas then became aware that the message on Mr. Clark's digital pager, which was provided to him by CACS, stated that if the client was calling about an existing claim they should call the CACS main office, but if they were calling about a new claim they should call Mr. Clark's cell phone directly. Mr. Dugas then presented claim forms used by Mr. Clark for a new company formed by Mr. Clark showing that Mr. Clark obtained clients for his new company while still employed by CACS in December 2000. Mr. Dugas also submitted a list of all claims written by Mr. Clark during the last six months of his employment and for two years after his termination. Mr. Dugas testified that based on the total commissions received by Mr. Clark during this time period Mr. Dugas suffered damages in the amount of $264,771.53. Mr. Dugas explained that this figure included the 25% that would have been paid to Mr. Clark and the 5% that Mr. Clark was entitled to after his termination based on the employment contract.
On cross-examination, Mr. Dugas was unable to provide evidence that CACS did business in all of the parishes listed in the non-compete clause. Rather, he testified that CACS did business in St. Tammany, Jefferson, and Orleans parishes. Mr. Dugas clarified that he was only seeking damages related to Mr. Clark doing business in the same area where he did business, not in areas where he did not conduct business. He further testified that the business performed by CACS is described in the name  class action claims service. Mr. Dugas denied removing Mr. Clark from the lead list; rather he testified that Mr. Clark was removed from the list at his own request.
Brian Clark testified that in his opinion, Mr. Dugas breached the employment contract when he removed Mr. Clark from the lead list without Mr. Clark's knowledge. Mr. Clark explained that after having passed out 2,000 fliers in October 2000, he noticed he was not receiving many phone calls. He contacted the CACS office and was told that he had been removed from the lead list. He had a meeting with Mr. Dugas on November 2, 2000 in which Mr. Dugas told Mr. Clark that he was removed from the lead list because he was spending too much time trying to get new clients and not enough time trying to resolve problem claims. Mr. Clark testified that Mr. Dugas told him that he did not want him to be a manager any longer. Mr. Clark explained that he did not resign from CACS at that point because he knew that his commissions on claims already submitted would decrease from 25% to 5%. Mr. Clark admitted he then set up a corporation in Florida doing business as Clark Claims. Mr. Clark admitted that he submitted six claims in the Houston area in November and December 2000 while still employed by CACS. Mr. Clark acknowledged that this was in violation of the non-compete clause, but explained that he did not think a Louisiana contract would be enforced in Texas and that he felt Mr. Dugas had breached the agreement when he removed him from the lead list. Mr. *599 Clark further testified that he was owed $20,922.35 for commissions on claims he collected prior to being terminated. Mr. Clark also admitted hiring four former agents of CACS.
At the conclusion of trial, the trial judge took the matter under advisement pending the post-trial memoranda of the parties. He then rendered judgment finding the non-compete agreement valid for the parishes and counties where CACS did business and that Mr. Clark formed a company that conducted the same type of business as CACS. Based on the total amount of commissions received by Mr. Clark for business conducted in the same areas as CACS of $358,624.91, the trial court awarded CACS damages in the amount of $134,000.00. The trial court also held that Mr. Clark was due the full commission on claims he completed prior to being terminated by CACS and thus, the judgment amount was offset by $20,922.35, casting Mr. Clark in judgment for a total of $113,077.65.

LAW AND DISCUSSION:
On appeal Mr. Clark argues that the non-compete clause is invalid because the business of CACS is not specifically defined in the clause and further that the entire non-compete clause should be held unenforceable because it is overbroad in its territorial restraint. We find no merit to either of these arguments.
LSA R.S. 23:921 C provides:
C. Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. An independent contractor, whose work is performed pursuant to a written contract, may enter into an agreement to refrain from carrying on or engaging in a business similar to the business of the person with whom the independent contractor has contracted, on the same basis as if the independent contractor were an employee, for a period not to exceed two years from the date of the last work performed under the written contract.
On its face, the non-compete clause at issue herein complies with this statute. The clause at issue prohibits persons acting as agents for CACS to refrain from engaging in the same or similar business for a period not to exceed two years from the date they last worked for CACS.
Mr. Clark cites Daiquiri's III on Bourbon, Ltd. v. Wandfluh, 608 So.2d 222 (La.App. 5 Cir.1992) in support of his position that the non-compete clause is not enforceable because the business of CACS is not particularly described. In Daiquiri's this Court found the non-compete clause was overly broad in its definition of the employer's business, "selling frozen drinks for consumption by the general public" because it prohibited plaintiff's former employees from any employment "at countless different businesses, stores, and stands which sell all forms of `frozen drinks.'" Id. at 225. Mr. Clark contends that the wording used in the CACS clause does not sufficiently describe the business of CACS. When asked to describe the business, Mr. Dugas testified that CACS does just what the name implies  it performs class action claims service. Mr. Clark formed another company that performed exactly the same service for the same class action suit. While Mr. Clark may have a valid argument if his new *600 company performed assistance with class actions involving a different claim, i.e. something other than Masonite siding, here there was never any indication anywhere in the record that CACS was in the business of performing any activities other than assisting property owners with collecting from the nationwide class action suit involving Masonite siding. In Baton Rouge Computer Sales, Inc. v. Miller-Conrad, XXXX-XXXX (La.App. 1 Cir. 5/23/00), 767 So.2d 763, the Court found that a non-compete clause was valid when there was no indication that the plaintiff engaged in any business other than computer sales as its name implies. The Court further held that the defendant knew exactly what type of business she was agreeing not to engage in when she signed the non-compete agreement. In the case at bar, Mr. Clark admitted in the trial court that he knew assisting claimants with Masonite siding claims in the areas where CACS did business was in violation of the non-compete agreement. Thus, we find the description of the business of CACS as used in the non-compete clause is not overbroad and find the non-compete clause valid.
Mr. Clark next argues that the entire non-compete clause cannot be enforced because it is overbroad in its geographic restraint in listing geographic areas where CACS did not conduct business. The non-compete clause lists 23 Louisiana parishes and the evidence shows that CACS did business in only three of these parishes. CACS states in its brief that it has never claimed that Mr. Clark did not have the right to compete in parishes or counties where CACS had not done business.
Our review of the jurisprudence indicates that when a non-compete clause is overbroad in its geographical boundaries, the Court should delete the overbroad portions and enforce the remainder of the geographic restriction provision. Swat 24 Shreveport Bossier, Inc. v. Bond, 33,328 (La.App. 2 Cir. 5/10/00), 759 So.2d 1047; Moreno and Associates v. Black, 99-46 (La.App. 3 Cir. 5/5/99), 741 So.2d 91. The evidence presented in this case shows that CACS was doing business in three Louisiana parishes and the Texas counties of Brazoria, Fort Bend, Galveston, Harris, Montgomery, and Walker. CACS did not request damages for business conducted by Mr. Clark outside of these areas. Mr. Clark admitted to conducting business in some of these same areas. Thus, we find the non-compete clause enforceable for the geographic boundaries in which CACS was actually conducting business.
For the foregoing reasons the judgment of the trial court in favor of CACS is affirmed. All costs are assessed against appellant.
AFFIRMED.